E-FILED
Tuesday, 23 April, 2013  01:20:08 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| EARL BARLOW, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12-CV-2058 |
| v. | ) | |
| | ) | |
| LT. TOFARI, CPL. ARREDONDO, | ) | |
| and | ) | |
| OFFICER RILEY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION

The case is before the court on Defendants' Motion for Summary Judgment (#50) on

Plaintiff's sole claim of excessive force in violation of the Fourteenth Amendment, pursuant to

42 U.S.C. § 1983. This court has reviewed the arguments of the parties and the documents

provided. Following this consideration, Defendants' Motion for Summary Judgment (#50) is

DENIED. Further, Defendants Tofari and Arredondo are DISMISSED on Plaintiff's motion.

## Background

On December 15, 2011, Plaintiff was a pretrial detainee at the Jerome Combs Detention

Center ("JCDC") in Kankakee County. (#50, #53 ¶1). JCDC rules permit inmates to leave their

cells to get food trays during mealtimes, and require that inmates immediately return to their

cells after, lock up, and eat in the cells. (#50, #53 ¶ 4). On December 15, 2011, an altercation

occurred at the Max A housing unit at the JCDC, during which some inmates refused to return to

their cells after they got their food trays. (#50, #53 ¶ 8). Over the intercom, Officer Riley ordered

the inmates to lock up in their cells. (#50, #53 ¶ 11). When the inmates continued to refuse to

lock up, Defendants Lieutenant Paul Tofari, Corporal Avelino Arredondo, Officer Nicholas

Riley, Officer Matthew Meehan, and Officer Bryan Benoit, along with other correctional

officers, went to the Max A housing unit. (#50, #53 ¶ 19). Defendants Tofari and Arredondo

spoke with a prisoner, Elton Pendleton, who the parties agree was the "ringleader", in order to

negotiate the inmates' refusal to lock up. (#50, #53 ¶¶ 25-29). After speaking with Tofari,

Pendleton returned to his cell and locked up. (#53, #53 ¶ 30).

Plaintiff testified that he was standing about four feet from his cell during this time. (#53

exh. B, Barlow Dep., 147:17). Benoit testified that he ordered Plaintiff to get on the ground. (#50

exh. I, Benoit Dep., ¶ 7). However, Plaintiff testified that other officers were ordering him to get

into his cell. (Barlow Dep., 147:6-20). Plaintiff testified that he was confused and did not know

what to do, because he could not simultaneously comply with both a directive to get on the

ground and a directive to get into his cell. (Barlow Dep., 147:18-20). Further, two other

prisoners, Bryan Moore and Aaron Thomas, testified that they had seen that Plaintiff's cellmate

had already closed and locked the cell door so Plaintiff could not have returned to his cell even if

he had wanted to. (#53 exh. F p. 37; #53 exh. G p. 14).

At this point, Plaintiff was still holding his meal tray. Benoit testified that he grabbed the

tray, and when Plaintiff did not release it, the tray somehow became dislodged and hit the wall

behind Benoit. (Benoit Dep., ¶ 9.) However, Benoit's written report, as read by Meehan during

Meehan's deposition, indicates that Plaintiff had begun to enter his cell when Benoit grabbed the

tray from Plaintiff, and does not indicate that the tray ever flew into a wall. (#53, Meehan Dep.

- 2 -

22:20-22). After a repeated order from Benoit to Plaintiff to get on the ground, Plaintiff

complied and lay down on the ground with his hands out in front of him. (#50, #53 ¶ 40; Barlow

Dep. 156:3-8). Benoit ordered Plaintiff to put his hands behind his back. (#50, #53 ¶ 41).

Plaintiff placed his left hand behind his back. (#50, #53 ¶ 42). Benoit then ordered Plaintiff to

place his right hand behind his back in ordered to be handcuffed. (#50, #53 ¶¶ 42-43). Plaintiff

then placed his right arm behind his back and used his left hand to hold onto his right hand. (#50,

#53 ¶ 44). Plaintiff testified that due to a prior injury, his right arm has a limited range of motion

and that he does not have enough control over his right arm and hand to place it on his back.

(Barlow Aff. ¶¶ 18-19; Barlow Dep. 156:9-164:7). Plaintiff testified that in order to prevent his

right arm from slipping off his back, he used his left hand to hold onto his right hand. (Barlow

Aff. 163:17-20 ("Q. So using your left hand you were holding onto your right fingers. A. Yes.

To keep it from dropping back to the floor.")). (*But compare* Barlow Aff. ¶ 19 ("only able to

firmly grasp my fingers") *with* Barlow Dep. 163:17-164:1 ("I was holding on to—to—I'm going

to say my right hand.")). Defendant Riley then attempted to complete the handcuff on Plaintiff

(#50, #53 ¶ 42).

Defendant Riley, in contrast, testified that he was only able to handcuff Plaintiff's *right*

wrist at first, but that Plaintiff took the handcuffed hand (the right one), and grabbed his *left*

wrist. (#53 exh. C, Riley Dep., 42:8-43:5). Then, because Plaintiff was using his *right* hand to

hold onto his *left wrist*, Riley testified that he could not get the handcuff on Plaintiff's *left* wrist.

(*Id*. at 43:3-9). Defendant Riley then stated that he treated Plaintiff as an "active resister", (Riley

Dep. 43:10-12), although Riley also admitted that he did not see Plaintiff throw a tray or behave

aggressively toward himself or any other officer (Riley Dep. 50:6-14). In order to induce

- 3 -

compliance, Defendant Riley testified that he "appl[ied] pressure" to Plaintiff's shoulder and back. (Riley Dep. 43:24-44:14). However, Plaintiff testified that Defendant Riley utilized a knee strike to Plaintiff's back, (Barlow Dep. 164:10-21), resulting in pain so severe as to cause his eyes to tear up, (Barlow Dep. 166:1-3; Barlow Aff. ¶ 24; #53, #54 Additional Material Facts ¶ 9), as well as continuing "tremendous pain, mostly when bending over and attempting to stand erect," (#53, #54 ¶ 14). Defendant Riley is approximately 5'11" or 6', and weighs 280 pounds. (Riley Dep. 7:24-8:4). The parties agree that neither Defendant Tofari nor Defendant Arredondo made any physical contact with Plaintiff, and that neither Defendant Tofari nor Defendant Arredondo saw what happened between Defendant Riley and Plaintiff. (#50, #53 ¶¶ 53-54).

On February 7, 2012, Plaintiff filed his Complaint (#1) against Defendants Bukowski, Downey, Tofari, Arredondo, and Riley. On March 15, 2012, the court dismissed Defendants Bukowski and Downey during a merit review screening (Minute Entry of March 15, 2012). On June 21, 2012, Plaintiff filed his Amended Complaint. (#23). On July 13, 2012, Defendants filed their Answer and Affirmative Defenses. (#24). On August 29, 2012, the court appointed students with the University of Illinois College of Law Federal Civil Rights Clinic, Mr. Paul Lazaro and Mr. Carey Ash to represent Plaintiff (Minute Entry of August 29, 2012). On February 13, 2013, Defendants filed the present Motion for Summary Judgment. (#50). On March 25, 2013, Plaintiff filed his Response. (#53). On April 8, 2013, Defendants filed their Reply. (#54).

## Analysis

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for

summary judgment, a district court has one task and one task only: to decide, based upon the

evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge*

*v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)*.* In making this determination, the court

must construe the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986*); Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir.

2010). However, "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at

248. If it is clear, based upon the undisputed facts, that a plaintiff will be unable to satisfy the

legal requirements necessary to establish his case, summary judgment is not only proper, but

mandated. *See Padula v. Leimbach,* 656 F.3d 595, 600–01 (7th Cir. 2011).


**I. Defendants Tofari and Arredondo**

To have individual liability under § 1983, a defendant must have been personally

involved in the alleged constitutional deprivation. *Palmer v. Marion County*, 327 F.3d 588, 594

(7th Cir. 2003). Alternately, a bystander "can be held liable under § 1983 if the bystander "(1)

had reason to know that a fellow officer was using excessive force or committing a constitutional

violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring."

*Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). Because both parties agree that neither

Defendant Tofari nor Defendant Arredondo saw the interaction between Plaintiff and Defendant

Riley, much less made physical contact with Plaintiff, neither defendant can have direct or

bystander liability under § 1983. In recognition thereof, Plaintiff consented to the voluntary

dismissal of Defendant Tofari on February 13, 2013, and in its Response, voluntarily dismisses

Defendant Arredondo. (#53 p. 1). Accordingly, Defendants Tofari and Arredondo are dismissed.


## II. Defendant Riley

"[P]retrial detainees couch excessive force claims as violations of their Fourteenth

Amendment rights to due process, not infringements on the Eighth Amendment's ban on cruel

and unusual punishment." *Lewis*, 581 F.3d at 473. This is because the Eighth Amendment

protects individuals from the imposition of "cruel and unusual punishments", U.S. Const. amend.

XIII, and "under the Due Process Clause, a detainee may not be punished prior to an

adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535

(1979). Further, because "[t]he Fourteenth Amendment right to due process provides at least as

much, and probably more, protection against punishment as does the Eighth Amendment's ban

on cruel and unusual punishment, *Forrest v. Prine*, 620 F.3d 739, 744 (7th Cir. 2010), "pretrial

detainees must arguably be afforded a higher standard than that provided by the Eighth

Amendment." *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996). However, as "the exact

contours of any additional safeguards remain undefined," *Lewis*, 581 F.3d at 474, the Seventh

Circuit has adopted the standards from the Eighth Amendment. *Forrest*, 620 F.3d at 744.

Accordingly, pretrial detainees are protected by the same standard as for prisoners in relation to

the use of excessive force. "Where a prison security measure is undertaken to resolve a

disturbance… that indisputably poses significant risks to the safety of inmates and prison staff,

we think the question whether the measure taken inflicted unnecessary and wanton pain and

suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).

Factors relevant to this inquiry include "whether jail officials perceived a threat to their safety and the safety of other inmates, whether there was a genuine need for the application of force, whether the force used was commensurate with the need for force, the extent of any injury inflicted, and whatever efforts the officers made to temper the severity of the force they used." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 668 (7th Cir. 2012).

*A. Perception of threat to the safety of correctional officers and other inmates*

Regarding the first element, construing the evidence in the light most favorable to nonmovant Plaintiff and draw all reasonable inferences in his favor, there is a genuine issue of material fact whether Defendant Riley perceived any threat to his safety or the safety of other inmates when he utilized a knee strike to Plaintiff's back. Defendant first argues that "[t]he correctional officers were faced with a housing unit of inmates who refused to lock up after receiving their dinner trays," and that Plaintiff became a security risk when he "did not follow officers' orders to lock up after he got his dinner tray or to get on the ground when the officers entered the housing unit." (#50 p. 10). This court does not agree. As a preliminary matter, the court need not belabor the physical impossibility of simultaneously complying with both orders. Defendant argues that Plaintiff should have figured out that he had only one option remaining when his cellmate closed and locked the cell door. Defendant states that "[i]t belies logic and experience for him to argue that he was confused on what to do when he saw six correctional

officers enter a cellblock together shouting orders at inmates." But just as this court liberally

interprets the actions taken by correctional officers in the heat of an altercation, it cannot

similarly require prisoners make clear-headed split-second decisions in similar situations. Had

Plaintiff dropped to the ground first, another correctional officer might just as easily have come

to the conclusion that he was "resisting orders" and demand that he stand by his locked cell door

instead. Regardless, the parties agree that Plaintiff did drop to the ground and place his hands

behind his back.

Defendant does not demonstrate that the dispute had risen to the point that there could

have possibly been a "threat to their safety" or "the safety of other inmates". Defendants Tofari

and Arredondo had spoken with Pendleton and had appeared to have resolved the issue and

Pendleton had returned to his cell. Plaintiff may have been momentarily noncompliant, but he

states, and this court must accept as true for the purpose of this motion, that he was confused as

to which order he was required to follow. In fact, when Defendant Riley ordered Plaintiff to get

on the ground a successive time, Plaintiff dove to the ground; when Defendant Riley ordered

Plaintiff to place his hands behind his back, Plaintiff complied to the best of his physical ability.

The parties do not dispute that Defendant was *prone on the ground*, not squirming, not fighting,

not flailing, and covered by a 280-pound correctional officer at the time the alleged knee strike

occurred. Because he complied without coercion and to the best of his ability, it is debatable

whether Defendant could possibly have perceived that Plaintiff posed a threat to his safety or to

the safety of other inmates at that point.

In the alternative, Defendant argues that the refusal to comply with a proper order places

the staff and other inmates in danger as a matter of law, citing to *Soto v. Dickey*, 744 F.2d 1260,

1267 (7th Cir. 1984) ("When an inmate refused to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger."). This court also does not agree. The following sentence in *Soto* states: "[T]he institution cannot permit an inmate to violate a rule or disobey an order and [] action must be taken to compel compliance with a lawful order." *Id*. It is not the handcuffing that Plaintiff challenges as excessive, but rather, the knee strike. The first order was to get on the ground. Plaintiff complied. The second order was to put his left hand behind his back. Plaintiff complied. The third order was to place his right hand behind his back. Plaintiff testifies that he physically could not comply, and instead did his best to do so by holding onto one hand with the other.

### B. Genuine need for the application of force

Regarding the second factor, there remains a genuine issue of material fact that there was any genuine need for the application of force in the manner that Defendant Riley deployed. Defendant Riley specifically did not testify that he ordered Plaintiff to let go of his hand. Instead, Defendant Riley states that he "applied his knee to [Plaintiff's] back or shoulder for pressure so that he could wrestle [Plaintiff']s hands free." (#50 ¶ 49). Given Plaintiff's limited range of motion, and his own assertion that he needed to hold his right arm in place lest it fall aside, indicating a lack of mobility and strength in that position, there would be no genuine need to apply pressure to Plaintiff's back in order to induce compliance, much less a knee strike.

### C. Use of force commensurate with the need for force

Regarding the third factor, just because there is an ongoing "security risk" does not necessarily permit correctional officers to deploy *any* amount of force; it must be commensurate with the need for that force. Construing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact exists as to whether the force actually used was commensurate with the need for force. A determination of this factor depends on a credibility assessment of whether the knee was "pressed" into Plaintiff's back or "struck" into Plaintiff's back. And even if Defendant Riley only "pressed" his knee in Plaintiff's back, and did not strike it, 280 pounds concentrated on one knee could be enough to maliciously and sadistically cause pain and harm, rather than merely to restore discipline. That determination is not appropriate at the summary judgment stage.

*D. Extent of injury inflicted and efforts made to temper severity of force used*

Regarding the fourth and final factor, "while a plaintiff need not demonstrate a significant injury to state a claim for excessive force under the Eighth Amendment, a claim ordinarily cannot be predicated on a *de minimis* use of physical force," *Outlaw v. Newkirk*, 259 F.3d 833, 837-38 (7th Cir. 2001), unless it is "repugnant to the conscious of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "[N]ot every push or shove by a prison guard violates a prisoner's constitutional rights." *DeWalt v. Carter*, 224 F.3d 607, 619-20 (7th Cir. 2000). Shoving a prisoner into a doorframe with enough force to cause bruising but no other visible injury is a *de minimis* use of force. *DeWalt*, 224 F.3d at 620. Emptying a bucket of water over a prisoner's head and hitting him in the head twice is a *de minimis* use of force not intended to cause pain or injury. *Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994). However, being

- 10 -

immobilized by other correctional officers, and then being punched in the mouth with a clenched

fist, was done "maliciously and sadistically to cause harm" and was not necessary to maintain or

restore discipline. *Thomas v. Stalter*, 20 F.3d 298, 302 (7th Cir. 1994).

      A genuine issue remains regarding whether Defendant Riley pressed or struck his knee

into Plaintiff's back, and if so, whether it was necessary and commensurate to finish handcuffing

Plaintiff. There is also no evidence regarding the extent of the injuries suffered by Plaintiff,

including whether any long-term or permanent injuries were inflicted, other than Plaintiff's

testimony that had pain. Thus, this court cannot unequivocally say that Defendant Riley did not

intend to "cause pain or injury" or use force "maliciously and sadistically". Accordingly,

summary judgment may not be granted for Defendant.


*E. Confusion regarding which of Plaintiff's hands was handcuffed and which was holding which*

      A point of curiosity must be mentioned here. Neither of the parties' briefs discussed a

discrepancy in the testimony. In Plaintiff's testimony, he stated as follows:

> Q. When Benoit told you to put your left hand behind your back, what did you
>     do?
> A. I put my left hand behind my back.
> Q. So you moved your left arm from where it was in front of you and put it to
>     the back?
> A. I put my left hand like—Yeah.
> Q. Then what happened after that?
> A. He said put your other hand behind your back. When I put my—I put my
>     right hand behind my back and I was holding my fingers.
> Q. So you were able to get your right arm behind your back.
> A. Yeah. I was holding my fingers because this—this here arm here, it don't
>     cooperate and I was holding it like this (indicating) so it wouldn't drop
>     back down.
> Q. So using your left hand you were holding onto your right fingers.
> A. Yes. To keep it from dropping back down to the floor.

Q. Let me ask you. Are you sure you were holding onto your right fingers or
    were you holding onto your right wrist?
A. I was holding on to—to—I'm going to say my right hand.
Q. Your right hand. Okay. **So using your left hand you were holding onto
    your right hand.**
**A. Yeah.**
Q. You didn't want it to slip off your back.
A. Yeah. Because I have no control. Yeah.

(Barlow Dep. 163:1-164:7) (emphasis added). Note that Plaintiff testifies that he was using his

*left* hand to hold onto his *right* hand.

Compare, then, Defendant Riley's testimony. He testified as follows:

Q. Okay. Were you able to get any portion of the handcuffs on him?
A. I got the right wrist on.

[ * * *]

Q. Okay. And you were able to get one handcuff on, correct?
A. Yes.
Q. And you were not able to get the second handcuff on immediately?
A. No, I wasn't.
Q. Why is that?
A. **Because he took the hand that was handcuffed and grabbed
    his—which was the right hand and grabbed his left wrist.**
Q. And how did that prevent you from handcuffing?
A. Because his handcuffs go on his wrist and I couldn't get the handcuffs on.

(Riley Dep. 42:8-43:9) (emphasis added). Here, Defendant Riley testifies that Plaintiff was using

his *right* hand, which was handcuffed, to hold onto his *left* wrist. Although it could be argued

that which hand was handcuffed first is not material to whether Defendant Riley acted

maliciously and with the intent to cause pain or harm, this discrepancy certainly goes to

credibility and Defendant Riley's state of mind at the time.

**III. Qualified immunity**

- 12 -

In the alternative, Defendant Riley argues that regardless of the findings above, he is protected by qualified immunity. This court does not agree. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The inquiry is whether (1) the facts alleged, taken in the light most favorable to Plaintiff, show that Defendant violated a constitutional right; and if so, (2) whether the right was clearly established at the time of the alleged injury. *Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). Regarding the second prong, "[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Leaf v. Shelnutt*, 400 F.3d 1070, 1080 (7th Cir. 2005). Plaintiff may point to "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

As discussed above, it is clearly established that in an excessive force claim, correctional officers may not "maliciously and sadistically" cause harm. *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). The proper inquiry therefore is, taking the evidence in the light most favorable to Plaintiff, whether a reasonable prison official could have reasonably concluded that when an inmate was prone on the ground and gripping his fingers in one hand, the Constitution permitted him to strike him in the back with his knee. Direct battery on an unresisting prisoner is widely proscribed. *See, e.g. Wilkins v. Gaddy*, 559 U.S. 34, 130 S. Ct. 1175, 1177, 175 L. Ed. 2d 995 (2010) (holding that a prisoner, who alleged that an officer punched, kicked, kneed and choked

- 13 -

him, was permitted to proceed with his excessive force claim); *Hill v. Shelander*, 992 F.2d 714, 718 (7th Cir. 1993) (denying qualified immunity to an officer who "pull[ed] the inmate from his cell by the shoulder and hair, slam[med] the inmate's head against the bars of an adjacent cell, and [struck] him twice in the face and knee[d] him in the groin."); *Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 249 (S.D.N.Y. 1998) (denying qualified immunity for allegedly kicking and stepping on an unresisting inmate's back).

While this case presents a boundary condition involving a single strike, and not, as in other more egregious cases, a series of strikes, sometimes with weapons, this court cannot say as a matter of law that a knee strike to an unresisting, prone prisoner's back was not malicious or intended to cause pain and injury. Defendant Riley does not actually contend that it would have been objectively reasonable for him to believe that the conduct *alleged by Plaintiff* was permissible. Only under Defendant's version of the facts—in which "[Plaintiff] prevented [Defendant] Riley from handcuffing him by using one of his hands to hold onto the other" and in which he was only able to restore order by "us[ing] his knee to finish handcuffing [Plaintiff]"—would he be entitled to qualified immunity. Although qualified immunity is nominally an issue of law, when the facts at issue bear directly upon whether it was objectively reasonable for a correctional officer to believe he had acted in compliance with clearly established law, this court cannot decide on summary judgment that Defendant Riley was entitled to qualified immunity. Accordingly, the Motion for Summary Judgment (#50) must be denied.

- 14 -

IT IS THEREFORE ORDERED THAT:

(1) Defendants Tofari and Arredondo are DISMISSED.

(2) Defendant Riley's Motion for Summary Judgment (#50) is DENIED.

ENTERED this 23rd day of April, 2013

**s/ Michael P. McCuskey**

MICHAEL P. McCUSKEY
U. S. DISTRICT JUDGE